**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Randy S Green,<br><br>Plaintiff,<br><br>v.<br><br>United States of America,<br><br>Defendant. | No. CV-17-00433-PHX-ROS<br><br>**ORDER** |

Plaintiff and Counterclaim Defendant Randy Green and Counterclaim Defendant Joseph Guerra owned Consolidated Group Services, LLC, and Consolidated Group Services, SA, LLC. The two companies failed to pay withheld income taxes to the Internal Revenue Service and the United States assessed trust fund recovery penalties under 26 U.S.C. § 6672 against Green and Guerra. Green sued the United States for refunds of penalties previously paid and the abatement of remaining penalties. The United States brought counterclaims against Green and Guerra for the unpaid balance of the assessed trust fund recovery penalties. Before the Court are the United States' Motion for Summary Judgment, (Doc. 62), Green's Cross-Motion for Summary Judgment, (Doc. 69), and the United States' Motion for Default Judgment Against Guerra, (Doc. 66). For the following reasons, the United States' Motion for Summary Judgment, (Doc. 62), is granted and Green's Cross-Motion for Summary Judgment, (Doc. 69), is denied.[1] The United States' Motion for Default Judgment, (Doc. 66), is granted in part and denied in part.

---
[1] Green's request for oral argument is denied because the issues have been fully briefed and oral argument will not aid the Court's decision.

**BACKGROUND**

Plaintiff and Counterclaim Defendant Randy Green ("Green") has worked in the staffing industry for over twenty years.[2] (Doc. 70-1 at 2.) Green has known Counterclaim Defendant Joseph Guerra ("Guerra") for about the same period of time. (Doc. 70-1 at 2.) On October 4, 2011, Green and Guerra became owners of Consolidated Group Services, LLC ("CGS"), an Arizona limited liability company. (Doc. 70-3 at 3.) Each owned 50 percent of the company. (Doc. 70-3 at 4.) In December 2012, Green and Guerra became owners of Consolidated Group Services, SA, LLC ("SA"), a Texas limited liability company. (Doc. 70-4 at 1.) As with CGS, Green and Guerra each owned 50 percent of SA. (Doc. 70 at 3.)

CGS and SA both provided temporary staffing services to the construction industry. (Doc. 70 at 3.) CGS serviced clients in Arizona and SA serviced clients in other states. (Doc. 70-1 at 2.) The two companies had approximately 100 to 200 employees combined. (Doc. 64-40 at 10.) CGS and SA were "identical in respect to ownership, management and operation." (Doc. 1 at 1.) Although the two companies were formally distinct, Green testified he "didn't differentiate . . . too terribly much" between the companies and was "not too sure how much [he] distinguished SA and CGS." (Doc. 64-40 at 16, 29.) The listed address of both companies was 2717 W Southern Avenue, Suite 4; Tempe, Arizona. (Doc. 63 at 3–4.) The companies had separate bank accounts but on at least one occasion, money was transferred from one company to another for payroll. (Doc. 64-21 at 4.) Green and Guerra were signatories on Chase checking accounts for CGS and SA. (Doc. 63 at 2–3.)

At both CGS and SA, Green used the title of "President." (Doc. 70 at 4.) Green states he was not technically president because the companies were not corporations and had no corporate officers, but he used the title because he was "the face of the business" and believed the title would help with acquiring new business. (Doc. 70 at 4.) Green and Guerra did not formally discuss their individual duties at the companies. (Doc. 70-2 at 6.)

---

[2] Unless otherwise noted, factual statements included in the Court's summary are undisputed.

Nonetheless, both understood Green's role was primarily sales while Guerra's role was operations, including running the accounting and tax departments. (Doc. 63 at 4.) Green testified that although Guerra had no formal education in accounting and tax, Green was comfortable with Guerra's duties because Guerra had "real life experience" in those fields. (Doc. 64-40 at 7–8.)

Green and Guerra spoke approximately three or four times a day, even when Green traveled out of state. (Doc. 64-40 at 6.) Green testified he often spoke with Guerra about the companies' finances, including "how much we were billing on a given week [and] what our costs were that week," as well as whether expenses were paid. (Doc. 64-40 at 6.) In addition, Green stated he "[a]bsolutely" knew "how much money was in the bank." (Doc. 64-40 at 6.) Green reviewed bank statements and accessed the checking accounts online. (Docs. 64-40 at 8; 70 at 4.) Green also had and exercised check signing authority, although he did not use it as often as Guerra did. (Doc. 70 at 4.) Green states during the first quarter of 2013, he signed 58 CGS checks while Guerra signed 1,642. (Doc. 70 at 4.) In the fourth quarter of 2013, Green signed 72 SA checks while Guerra signed 888. (Doc. 70 at 4.) Green testified he had the authority to hire and fire employees both in sales and in the office, and has hired sales employees. (Doc. 64-40 at 6.)

For the payroll tax quarter ended March 31, 2013, CGS filed a Form 941 that set forth a balance due and owing of $244,809.01. (Doc. 63 at 5.) In April 2013, Guerra informed Green of a "significant tax issue," involving CGS, that followed a client default on a $250,000 payment obligation. (Doc. 70-1 at 3.) Guerra told Green that CGS was "not making the necessary payroll payments or tax payments." (Doc. 64-40 at 11.) Prior to this conversation, Green had "assumed" Guerra was properly withholding income taxes from employees' wages and "taking care of the necessary items" regarding taxes. (Doc. 64-40 at 10.) Green further testified he was not aware of IRS-related issues until his conversation with Guerra. (Doc. 64-40 at 10.) On April 23, 2013, after learning of CGS's tax issues, Green called the IRS 1-800 number. (Doc. 64-40 at 11.) Green left a message stating he was trying to "get some information" on the tax issue and "figure out how [they] can get it

. . . squared up." (Doc. 64-40 at 11.) The IRS never returned Green's phone call. (Doc. 63 at 6.)

After Green's phone call to the IRS, Green remained concerned about the tax issue and spoke to Guerra about it at least once a week. (Doc. 64-40 at 11–12.) Green testified he believed Guerra was "squarely on" the payroll tax issue. (Doc. 64-40 at 12.) Green further testified Guerra hired an accountant—although Green does not remember the accountant's name—and Green "assumed that it was being taken care of." (Doc. 64-40 at 12.) From April to June of 2013, Green continued to take his salary and car allowance at CGS and kept charging expenses against the checking account. (Doc. 64-40 at 12.) Green also continued to sign CGS checks to himself and other non-IRS creditors. (Doc. 63 at 6.) During this time, Green never asked Guerra whether SA also had tax issues. (Doc. 64-40 at 15–16.)

In May 2013, Green received notice from the IRS that he was a potentially responsible person for the delinquent payroll taxes of CGS. (Doc. 64-2 at 5.) On August 20, 2013, IRS Revenue Officer Valerie Pichette ("RO Pichette") met in person with Green and Guerra to discuss CGS's delinquent federal payroll tax liabilities for the third and fourth quarters of 2012 and the first quarter of 2013. (Doc. 62-7 at 2–3.) Green testified he believed this meeting was required "in order to get the installment agreement approved for the issues of 2012 and '13." (Doc. 70-2 at 15.) At the meeting, RO Pichette told Green and Guerra that she "would be assessing them the Trust Fund Recovery Penalty ('TFRP') to collect the federal payroll taxes that were withheld from the employees of CGS but not paid over the IRS." (Doc. 62-7 at 3.) RO Pichette completed two Forms 4180 during the meeting and recorded information by hand. (Doc. 62-7 at 3.) Guerra and Green signed the forms after the interview. (Doc. 64-40 at 18.)

The Form 4180 signed by Green stated the business used the Electronic Federal Tax Payment System ("EFTPS") to make tax deposits and the PINS or passwords were assigned to Guerra. (Doc. 62-8 at 2.) It also stated Green determined "financial policy for the business," and had "knowledge withheld taxes were not paid." (Doc. 62-8 at 1.) In answer

to the question: "Who files the returns electronically[?]," Pichette wrote "Joe Guerra / Green Shades.[3]" (Doc. 62-8 at 2.) The form stated both Guerra and Green authorized the payment of other financial obligations—including rent, utilities, and payroll— during the time the delinquent taxes were increasing. (Doc. 62-8 at 2.) Following the interview, RO Pichette recorded an "ICS History Transcript" summarizing the interview. (Doc. 70-8 at 5.) Green understood CGS's tax problems to be a serious issue after meeting with RO Pichette. (Doc. 64-40 at 21.) Nevertheless, Green continued to sign CGS checks payable to non-IRS payees, use his CGS debit card to charge purchases against CGS's checking account, take his CGS car allowance, and receive his CGS salary in the amount of $125,000 per year. (Doc. 63 at 8.)

On September 30, 2013, RO Pichette sent Green a letter informing him the IRS was proposing to assess him under 26 U.S.C. § 6672 as a personally liable individual who was "required to collect, account for, and pay over [taxes] for the business." (Doc. 62-10 at 4.) The letter informed Green the proposed personal liability was the "Trust Fund Recovery Penalty," which is "equal to the unpaid trust fund taxes which the business still owes the government." (Doc. 62-10 at 4.) On January 13, 2014, the IRS assessed the trust fund recovery penalty against Green for CGS's quarter ended March 31, 2013, in the amount of $158,042.84. (Doc. 64-13 at 2.) Assessments were also made against Guerra. (Doc. 11 at 17.) Guerra continued his discussions with RO Pichette and the IRS approved an Installment Agreement; the parties dispute whether the Installment Agreement was approved in October or December 2013. (Docs. 63 at 9; 70 at 7.) At the time the Installment Agreement was approved, CGS owed $336,639.53 in federal payroll taxes. CGS was required to make approximately twenty-four monthly payments of $13,860.00, beginning on January 15, 2014, until the total liability was paid. (Doc. 63 at 9.) CGS paid four of the payments required by the Installment Agreement, with the last payment made in June 2014. (Doc. 63 at 9.) In July 2014, CGS attempted to make a fifth payment but it was dishonored. (Doc. 63 at 9.) Green testified that after the meeting with RO Pichette,

---

[3] Neither party has stated the identity of Green Shades.

he personally did not do anything in particular to address the tax problem because he believed the "meeting was going to facilitate the problem" and CGS was "going to be able to make payments to get the problem resolved." (Doc. 64-40 at 21.) Green asked Guerra whether he was making payments on a monthly basis and checked "periodically" to make sure the installment plans were being made. (Doc. 64-40 at 21.) Green testified CGS made payments "[u]p until legal counsel was hired" because Guerra told him "a tax attorney could secure better terms" for CGS. (Doc. 64-40 at 22.)

Throughout 2013, Green assumed SA was properly filing and paying its payroll tax returns. (Doc. 63 at 10.) After the August 2013 meeting with Pichette, Green did not ask Guerra whether SA was also having issues with its taxes. (Doc. 64-40 at 30.) Green states CGS's tax troubles were the result of a client default and he had no "cause to question" whether Guerra was properly taking care of SA's taxes. (Doc. 64-40 at 30.) For the payroll tax quarter ended December 31, 2013, SA filed its Form 941 that set forth a balance due and owing of $347,104.48. (Doc. 63 at 10.) During this quarter, Green signed SA's checks to non-IRS creditors. (Doc. 63 at 11.) Green also made debit card purchases against SA's checking account each month from October 2013 through February 2014. (Doc. 63 at 11.)

On December 19, 2013, Green and Guerra formed 2G Staffing Services ("2G"), of which they both owned 50 percent.[4] (Doc. 63 at 11.) Green's title at 2G was "President." (Doc. 63 at 11.) 2G's listed address was the same Tempe, Arizona address that CGS and SA used. (Doc. 63 at 11.) 2G had some of the same clients and provided similar services as CGS and SA. (Doc. 64-2 at 10.) In January 2014, CGS transferred $48,000 to 2G and SA wired $200,000 to 2G. (Doc. 63 at 12.) Around this time, SA also paid checks in the amounts of $60,000 and $125,000 to 2G. (Doc. 63 at 12.)

On August 12, 2014, IRS Officer Russell Nelson ("RO Nelson") sent a letter to Green and his registered power of attorney William Van Dusen. (Doc. 63 at 14.) The letter informed Green that RO Nelson had scheduled a meeting for September 9, 2014, to discuss

---

[4] All of Green's relevance-based evidentiary objections to facts about 2G are overruled. The Court concludes facts regarding the formation of 2G and transfer of money from CGS and SA to 2G are relevant to Green's responsibility and willfulness, even if 2G's tax liabilities are not at issue in this litigation.

- 6 -

Green's potential personal liability for unpaid trust fund taxes owed by SA. (Doc. 62-3 at 1.) Green testified that receipt of this letter was "the first time [he] learned that SA owed federal taxes." (Doc. 64-40 at 34.) The scheduled meeting did not occur because Green and Guerra did not bring their power of attorney with them. (Doc. 63 at 15.) RO Nelson continued his investigation but did not reschedule the interview or interview any other employees of SA. (Doc. 70 at 8.) RO Nelson reviewed bank statements and copies of checks from SA's bank account. (Doc. 70 at 8.) On January 12, 2015, the IRS assessed the trust fund recovery penalty against Green for SA's quarter ended December 31, 2013, in the amount of $122,768.41. (Doc. 63 at 15.) A penalty was also assessed against Guerra. (Doc. 11 at 19.)

Green made partial payments against the § 6672 assessments regarding both CGS and SA's payroll taxes. In February 2017, Green sued the United States, demanding a "refund of TFRP for the first quarter of 2013 in the amount of $1,000.00 previously paid and the abatement of the remaining penalties and interest for the first quarter of 2013," and "a refund of return preparer penalties for the fourth quarter of 2013 in the amount of $1,000.00 previously paid and the abatement of the remaining penalties for the fourth quarter of 2013." (Doc. 1 at 4–5.) The United States brought counterclaims against Green and Guerra for unpaid balances under the § 6672 assessments. (Doc. 11.) The United States and Green cross-moved for summary judgment. According to the United States, as of August 1, 2018, Green owed $468.35[5] for CGS's unpaid trust fund taxes and $267.318.59 for SA's unpaid trust fund taxes. (Doc. 63 at 16.) Because Guerra failed to answer or defend against the action, the United States moved for default judgment against Guerra in the amount of $5,860.37 for CGS's unpaid trust fund taxes and $267,318.59 for SA's unpaid trust fund taxes. (Doc. 66-1 at 15.) Guerra did not respond.

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[5] These figures do not include interest accrued after August 1, 2018, which the United States also requests.

law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing a motion for summary judgment, all evidence must be construed in the light most favorable to the non-moving party.

Here, both parties move for summary judgment on the same issue. "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151 (9th Cir. 2015) (quoting *Fair Hous. Council of Riverside Cty. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

When a party fails to defend a lawsuit, the Court may determine damages and enter a default judgment. Fed. R. Civ. P. 55. "Factors which may be considered by courts in exercising discretion as to the entry of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

**ANALYSIS**

On summary judgment, the United States and Green dispute Green's liability under § 6672 for the unpaid taxes of CGS and SA. "The recovery of a penalty under section 6672 entails showing that the individual both was a 'responsible person' and acted willfully in failing to collect or pay over the withheld taxes." *Davis v. United States*, 961 F.2d 867, 869–70 (9th Cir. 1992). In an action to collect tax, the United States bears the initial burden of proof. *Oliver v. United States*, 921 F.2d 916, 919 (9th Cir. 1990). The United States satisfies this burden by introducing into evidence its assessment of taxes due. *Id.* The

United States' tax assessment is generally accorded a presumption of correctness and the "burden then shifts to the taxpayer to prove that he is not liable." *Nakano v. United States*, 742 F.3d 1208, 1211 (9th Cir. 2014). The presumption of correctness may not arise if the "assessment is without rational foundation or is arbitrary." *Oliver*, 921 F.2d at 920. In the event the taxpayer shows the assessment is without rational foundation or is arbitrary, the burden of proof shifts back to the United States.[6] *United States v. Sabaratnam*, CV 14-04504, 2015 WL 6667765, at *11 (C.D. Cal. Sept. 8, 2015).

First, Green must be a "responsible person" under § 6672. An individual is responsible under § 6672 if "such individual had the authority required to exercise significant control over the [company's] financial affairs, regardless of whether he exercised such control in fact." *Purcell v. United States*, 1 F.3d 932, 937 (9th Cir. 1993). "[R]esponsibility is a matter of status, duty, and authority, not knowledge." *Davis*, 961 F.2d at 873. Even if "an individual's daily functions may be unrelated to financial or tax-related decision-making, that individual may be 'responsible' by having the 'authority to pay or to order the payment of delinquent taxes.'" *United States v. Jones*, 33 F.3d 1137, 1140 (9th Cir. 1994). Courts consider a number of factors in evaluating responsibility, including whether the individual is an owner, director, or officer, has check-signing authority, has the authority to hire and fire employees, and has control over the decision-making process over the allocation of funds among creditors. *Jones*, 33 F.3d at 1140–41.

Here, Green is a "responsible person" for the unpaid taxes of CGS and SA. There is no dispute that Green was a 50 percent owner of both companies.[7] In addition, Green had and exercised the authority to hire and fire employees and the authority to sign checks to pay creditors. Although Guerra was in charge of running the tax and accounting departments, Green testified he spoke regularly with Guerra about the companies' finances and expenses and accessed the companies' bank accounts. Green argues he did not in fact

---

[6] Green argues the United States' tax assessment against Green regarding SA's unpaid taxes is arbitrary. The Court needs not address this question because even assuming the United States has the burden of proof, Green is liable under § 6672.

[7] Although Green argues he was not technically president of the companies because limited liability companies do not have corporate officers, he held himself out as president of CGS and SA.

hire employees outside of sales and that he did not sign as many checks as Guerra did. These arguments are unavailing. The Court considers the authority required to exercise significant control; and in any event, Green *did* exercise this authority, albeit not as frequently as Guerra.

Green's argument that his sole responsibility was in sales is contradicted by evidence in the record. During his interview with RO Pichette, Green signed IRS Form 4180, which stated he determined financial policy for CGS, authorized payment of financial obligations of CGS during the time delinquent taxes were increasing, and was authorized to sign Form 941 returns for CGS.[8] (Doc. 70-8 at 1–2.) And as the United States notes, Green personally called the IRS about CGS's delinquent taxes in April 2013, and met with an IRS officer about these taxes. (Doc. 64-40 at 11.) Green communicated with Guerra to confirm installment payments were made and testified he was "okay with CGS stopping its installment payments" after Guerra informed him a tax attorney could assist them in securing better terms. (Doc. 64-40 at 22.) Although Green did not sign a Form 4180 with regard to SA, Green's Complaint alleges "CGS and [SA] were identical in respect to ownership, management and operation" and Green testified he did not distinguish between the two. *See Casumpang v. Hawaiian Commercial and Sugar Co.*, 712 Fed. App'x 709, 710 (9th Cir. 2018) ("Factual assertions in pleadings . . . are considered judicial admissions conclusively binding on the party who made them." (citation omitted)). Thus, Green is a "responsible person" under § 6672 with regard to both CGS and SA.

Next, the Court considers whether Green acted willfully in failing to pay the withheld taxes. Under § 6672, willfulness requires a "voluntary, conscious and intentional act to prefer other creditors over the United States." *Philips v. United States Internal Revenue Serv.*, 73 F.3d 939, 942 (9th Cir. 1996) (citation omitted). Willfulness does not

---

[8] Green now disputes the accuracy of this Form 4180, which he presumably reviewed before signing. In any event, Green's dispute regarding when he first learned about CGS's tax liabilities is irrelevant because the United States assumes Green's version of the events is accurate for the purposes of its motion. (Doc. 75 at 10.) Green's other dispute regarding whether he actually authorized other obligations of CGS to be paid is contradicted by evidence in the record. (Doc. 71 at 5.)

- 10 -

require actual knowledge of the company's failure to pay over taxes; "reckless disregard" is sufficient to satisfy this prong. *Id.* at 943. A responsible person acts with reckless disregard if he "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." *Id.* (citation omitted).

There is no question Green acted willfully regarding CGS's payroll tax liabilities for the first quarter of 2013. Green admitted he learned of CGS's payroll tax liabilities in April 2013. (Doc. 64-40 at 11.) Green then called the IRS to discuss unpaid taxes. (Doc. 64-40 at 11.) After Green learned of CGS's delinquent taxes, he continued to sign checks payable to himself and non-IRS creditors, and charged amounts against CGS's checking account. (Doc. 64-40 at 12.) In his Response, Green does not contest that he acted willfully with regard to CGS's unpaid taxes. Thus, Green is liable under § 6672 and summary judgment is granted to the United States as to the § 6672 assessment against Green regarding CGS's payroll tax liabilities.

Willfulness is a closer question with regard to the assessment against Green for SA's tax liabilities. SA filed its Form 941 that set forth a balance due and owing of $347,104.48 for the fourth quarter of 2013. There is no dispute that during and shortly after the fourth quarter of 2013, Green made payments to non-IRS creditors from SA's account. However, Green argues he did not act willfully because he made those payments without knowledge of SA's tax liabilities. Green testified he did not learn of SA's tax liabilities until August 2014, when he received the IRS notice of the scheduled interview with RO Nelson. By then, SA had no money left in its checking account. Green further testified that before he received notice from the IRS about SA, he was not concerned about SA's taxes and did not ask Guerra about them—even after learning of CGS's tax liabilities and meeting with RO Pichette. The United States argues Green acted with reckless disregard because after learning of CGS's tax liabilities, he should have asked Guerra about SA's taxes. Green argues CGS's unpaid taxes were due to a client default and he was unconcerned about SA's taxes because SA had not faced the same problem.

The United States is correct that Green acted with reckless disregard and was therefore willful under § 6672. Green knew CGS had failed to pay taxes and that SA was operated in an identical manner; thus, Green should have inquired into SA's tax liabilities. In *United States v. Leuschner*, the defendant was director and general manager of a company and relied on a "Controller" to keep books, pay the bills, and file tax returns. 336 F.2d 246, 247 (9th Cir. 1964). When the company failed to pay taxes and was forced to close down, the defendant arranged a second company to carry on the business and relied on the same Controller to operate exactly as he did the first company. *Id.* The second company subsequently failed to pay its withheld income taxes. *Id.* The defendant argued he did not willfully fail to make the tax payments for the second company because he relied entirely on the Controller to pay taxes and did not know taxes were not paid until the IRS levied on the second company's bank account. *Id.* The Ninth Circuit held that with regard to the second company, the defendant's conduct was willful because he knew the Controller, "on whom he relied, had failed to see that such taxes were paid and had preferred other creditors" at the first company. *Id.* at 248. Despite knowing this information, the defendant "did absolutely nothing to see that this did not happen again" at the second company. *Id.* Here, Green knew CGS, under Guerra's watch, had failed to make tax payments. Green admitted CGS and SA were "identical in respect to ownership, management and operation." (Doc. 1 at 1.) Green also knew Guerra had no formal education in tax or accounting, yet trusted Guerra to oversee tax and accounting at both companies. Even after Green learned CGS had failed to pay taxes and the IRS proposed to assess him under § 6672, Green nevertheless remained unconcerned about taxes at SA and "did absolutely nothing to see that this did not happen again." *Leuschner*, F.2d at 248. Such circumstances presented a "grave risk" that taxes were not being paid by SA and Green could easily have found out by simply asking Guerra. As such, Green's conduct was willful and summary judgment is granted to the United States as to its assessment against Green regarding SA's tax liabilities.

Finally, the Court considers the United States' Motion for Default Judgment Against Guerra. (Doc. 66.) Guerra failed to file an appearance, answer, or defend against the action. (Doc. 40 at 2.) Guerra also failed to respond to the United States' Motion for Default Judgment.

For the purpose of showing personal jurisdiction, the United States presents facts about Guerra's contacts with Arizona. (Doc. 66-1 at 1–4.) Guerra testified he lived and worked in Arizona from 2010 to July 2013—including the first quarter of 2013, for which CGS failed to pay withheld income taxes. As such, the Court has personal jurisdiction over Guerra with regard to count I of the United States' counterclaim against Guerra. Count II involves SA's failure to pay income taxes for the fourth quarter of 2013. During the fourth quarter of 2013, Guerra did not reside in Arizona. In addition, SA was formed in Texas rather than Arizona, although its listed address was in Tempe, Arizona. (Doc. 66-1 at 3.) The United States has cited no law establishing the Court has personal jurisdiction over Guerra under these circumstances. And although the United States argues "Guerra had much more than the required minimum contacts with Arizona," it has not explained how or why. (Doc. 66-1 at 15.) Thus, default judgment is denied as to count II and the United States is ordered to submit additional briefing regarding this issue.

Having considered the *Eitel* factors, the Court concludes default judgment against Guerra is appropriate for count I. The United States has shown it will suffer prejudice if default judgment is not granted, the merits of its counterclaim weigh in favor of granting default judgment, the amount and nature of the requested relief weigh in favor of granting default judgment, and Guerra's default was not caused by inexcusable error.

Accordingly,

**IT IS ORDERED** the United States' Motion for Summary Judgment (Doc. 62) is **GRANTED**.

**IT IS FURTHER ORDERED** Green's Cross-Motion for Summary Judgment (Doc. 69) is **DENIED**.

**IT IS FURTHER ORDERED** the United States' Motion for Default Judgment (Doc. 66) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** no later than March 21, 2019, the United States shall submit additional briefing on the issue of personal jurisdiction over Guerra for count II of its counterclaim.

**IT IS FURTHER ORDERED** no later than April 1, 2019, the parties shall submit a joint proposed form of judgment. The United States shall also submit an explanation for the amounts owed, in particular explaining why the amounts owed by Green and Guerra are different.

Dated this 11th day of March, 2019.

_____
Honorable Roslyn O. Silver
Senior United States District Judge